IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BIJU GEORGE,** | : | **Civil No. 1:18-cv-00766** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA TURNPIKE** | : | |
| **COMMISSION,** | : | |
| | : | |
| **Defendant.** | : | **Judge Sylvia H. Rambo** |

## <u>MEMORANDUM</u>

Before the court is Defendant Pennsylvania Turnpike Commission's motion for summary judgment. (Doc. 62.) For the reasons set forth below, the motion will be granted in part and denied in part.

## I.  **BACKGROUND**

This action arises from Plaintiff Biju George's claims that his former employer, the Pennsylvania Turnpike Commission ("PTC"), discriminated against him on the basis of his race and national origin and retaliated against him for complaining about discrimination. George is an individual of Indian national origin and Asian race. PTC is an agency of the Commonwealth of Pennsylvania with a mission "to responsibly operate and manage a safe, reliable and efficient toll road system." (Doc. 62-5 p. 11.)

George was employed by PTC from February 23, 2015 until January 28, 2016 as a Director of the Enterprise Solution Support Group within its Information Technology Department. Throughout the duration of his employment, George reported to Scott Fairholm, PTC's Chief Information Officer, who had also recommended George for hire. Underneath George were three senior managers, including Don Franklin and Stephen Husic, who reported directly to him. (*See* Doc. 62-2 ¶¶ 6, 16.)

On July 20, 2015, Fairholm drafted a note to file expressing concerns with George's work performance, including that George did not appear to understand or share Fairholm's vision for PTC; the perception by some women in the department that George unfairly discounted their opinions; George's attendance; George's tendency to not complete work assigned by two particular employees; and the need for George to improve his relationship with his peers on the management team. (*See id.* ¶ 21.)[1]

Around August 2015, George alleged to PTC Director of Diversity & Inclusion Myneca Ojo that Fairholm stated to him "You do not like white people." Ojo advised George that he could file a formal complaint about the matter, but

---

[1] Though George's Counterstatement of Material Facts claims that the note to file is hearsay and unauthenticated, it is not being offered for the truth of the matter asserted, and PTC adequately authenticated the document on reply. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:06-CV-1105, 2015 WL 11604481, at *1 (M.D. Pa. Mar. 9, 2015).

George declined. According to George's deposition testimony, Fairholm made the comment around summer 2015 and he repeated it approximately twice more during George's employment. (*See* Doc. 72 ¶¶ 15, 46.)

Around September 2015, George received a performance evaluation by Fairholm for the period between February 23, 2015 through July 31, 2015 and with an appraisal date of September 8, 2015. The overall rating was "Satisfactory." George was appraised as "Needs Improvement" in the area of Work Results, with a comment by Fairholm noting, "Unfortunately since your arrival only one project has been delivered on time and within budget. While most of these efforts began before you arrived, you should be focusing a lot of your effort on ensuring improvement in this area." George was rated as "Satisfactory" in the areas of Customer Service Skills, Dependability, Judgment, Initiative, Teamwork/Interpersonal Skills, Job Knowledge and Skills, and Supervision/Management. Fairholm noted in the evaluation that despite the overall rating of satisfactory, there were "a number of areas" he wanted George "to focus on in the coming months." These areas included: improving the quality and quantity of interactions with co-workers; ensuring that the interactions with peers and subordinates promote customer service, respect, diversity, inclusiveness, collaboration, and effective communication; understanding and communicating Fairholm's vision for the IT Department; being engaged in meetings; being available and improving responsiveness to Fairholm, peers and

subordinates; taking ownership of all enterprise and business software application development; ensuring that projects are delivered on-time and within budget, and managing their full lifecycle as cost effectively as possible; learning PTC policies and management practices and ensuring compliance; and working with Fairholm to know when to act independently and when to seek approval. On October 15, 2015, George commented on his evaluation, "I am fine with the evaluation for the first 6 months." (*See* Doc. 62-2 ¶¶ 23-29.)

According to testimony by George, in the fall of 2015, Fairholm told George that he wanted PTC to accept bids for professional services that had been submitted by particular companies that were not headquartered in India, and that he did not want PTC to accept bids by two particular Indian companies. George's responsibilities included participating in the "request for proposal" ("RFP") process that PTC used to select vendors for professional services. George sat on a three-to-four-person panel that was tasked with assessing the vendors that had submitted proposals. The panel's responsibility was to narrow down the universe of potential vendors to a list of four or five companies, taking into account the completeness of the proposal and the qualifications and rates of each company. The panel would then submit its list to Fairholm, who in turn presented a list of recommended companies to the commissioners of the Turnpike Commission. George testified that, separate and apart from his work on the panel, he sometimes held more informal

conversations with Fairholm about the companies that had submitted proposals in response to RFPs. According to George, on one such occasion, Fairholm referenced two specific Indian vendors that had submitted proposals, Infosys and Wipro, and told George, "I don't want these Indian vendors" or "I don't want any of these Indian vendors." According to George, Fairholm instead "hand picked certain companies" that were not headquartered in India, and told him, "Biju, I only want these companies." George testified that he did not know why Fairholm selected the particular non-Indian vendors, but he acknowledged that the companies were properly qualified.[2] George also testified that he could not recall whether his panel had actually recommended the two Indian companies that Fairholm rejected. (*See* Doc. 62-6 pp. 42-51.)

In January 2016, George sat on a hiring panel that interviewed and recommended qualified candidates for employment with PTC. One such candidate recommended by George was Ashok Pedapati, an individual of Indian national origin, who was recommended for the position of SAP Business Process Supervisor. Another such candidate that George recommended was Bhaskar Suryakumar, also an individual of Indian national origin, who at the time was employed by PTC as an SAP Business Process Specialist, and who was recommended for promotion to the

---

[2] When asked in his deposition whether he thought Fairholm's selection was because of a prior relationship with the vendors, George responded "Maybe." (Doc. 62-6 p. 48.)

positions of "Senior" SAP Business Process Specialist. George testified that Fairholm responded to George's recommendation to hire Pedapati by asking him, "Is he Indian as well?" and to George's recommendation to promote Suryakumar by asking "Why did you choose this person? So you don't like white people?" Fairholm nevertheless recommended both candidates. (*See* Doc. 72 ¶ 57; Doc. 62-2 ¶¶ 76-77; Doc. 71-3 pp. 3, 7.)

On January 21, 2016, Fairholm met with PTC Chief Executive Officer Mark Compton to discuss terminating George. Fairholm testified that he had previously sought advice from Compton on how to improve George's work performance, but that he no longer believed improvement was feasible. Fairholm then met with PTC Director of Human Resources Sheri Norris. Norris testified she and Fairholm began discussing Fairholm's concerns with George's performance beginning in the fall of 2015 and over the course of several months. Norris testified that after listening to Fairholm's concerns about George's performance and reviewing George's August 2015 performance evaluation, she agreed with Fairholm's recommendation to terminate George. (*See* Doc. 62-2 ¶¶ 76-82.)

On January 23, 2016, Fairholm reflected in a note to file that George "ha[d] not been pulling his weight" and that he was "putting the organization at risk by not ensuring that QA is complete."[3] (*See id*. ¶ 46.)

On January 28, 2016, Fairholm and Norris met with George and informed him that PTC was terminating his employment. George asked for a reason for his termination, and Norris advised him that it was in PTC's best interest to not the continue the employment relationship. PTC does not give at-will employees reasons when their employment is terminated. (*See id.* ¶ 88.)

On April 21, 2016, following George's termination, George filed a discrimination complaint with PTC. PTC commenced an investigation and conducted interviews with George, Fairholm, and Franklin. In April 2016, PTC suspended the investigation after learning that George filed a Charge of Discrimination with the EEOC. (*See id.* ¶¶ 91-95.)

On April 9, 2018, George initiated this action by filing a complaint. The complaint asserts claims for race and national origin discrimination and retaliation pursuant to Title VII, the Pennsylvania Human Relations Act, 42 U.S.C. § 1981, and 42 § U.S.C. 1983. On June 29, 2020, PTC filed a motion for summary judgment on

---

[3] Though George's Counterstatement of Material Facts claims that the note to file is hearsay and unauthenticated, it is not being offered for the truth of the matter asserted, and PTC adequately authenticated the document on reply.

all George's claims. (Doc. 62.) The motion has been fully briefed and is ripe for review.

## II.   <u>STANDARD OF REVIEW</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law and is "genuine" only if there is a sufficient evidentiary basis for a reasonable factfinder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party

may not simply sit back and rest on the allegations in its complaint; instead, it must

"go beyond the pleadings and by [its] own affidavits, or by the depositions, answers

to interrogatories, and admissions on file, designate specific facts showing that there

is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks

omitted); *see also Saldana v. Kmart Corp*., 260 F.3d 228, 232 (3d Cir. 2001).

Summary judgment should be granted where a party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "Such

affirmative evidence – regardless of whether it is direct or circumstantial – must

amount to more than a scintilla, but may amount to less (in the evaluation of the

court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v.

Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.  <u>DISCUSSION</u>

### a. <u>PTC is not entitled to summary judgment on George's discrimination claims, which may proceed under a mixed motive framework.</u>

The complaint alleges race and/or national origin discrimination under Title

VII, the PHRA, 42 U.S.C. § 1981, and 42 § U.S.C. 1983.[4] "When used as parallel

---

[4] PTC makes various arguments that it is entitled to summary judgment on George's PHRA and constitutional claims due to its status as a Commonwealth agency. It does not, however, offer any substantive analysis to support its treatment as a state actor under federal law. *See Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1142–43 (3d Cir. 1995) (affirming district court's finding that PTC is not an arm of the state for purposes of Eleventh Amendment immunity). Nor

bases for relief or companion remedies" each statute requires "the same elements for their causes of action and courts incorporate the same standards when assessing employment discrimination claims." *Bullock v. City of Philadelphia*, No. 19-CV-1183, 2020 WL 4365601, at *6 (E.D. Pa. July 30, 2020) (citation and brackets omitted); *see Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997) ("Our application of the *McDonnell Douglas–Burdine* framework is applicable to Stewart's allegation of racial discrimination under 42 U.S.C. §§ 1981 and 1983"); *Vaughan v. Boeing Co.*, 733 F. App'x 617, 622 (3d Cir. 2018) ("All claims of race discrimination brought under Title VII, § 1981, or the PHRA are governed by the 'familiar burden-shifting framework set forth in *McDonnell Douglas*[.]'").

Employment discrimination cases based on a theory of pretext are analyzed using the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973). Pursuant to the *McDonnell Douglas* framework, a plaintiff must first present evidence sufficient to convince a reasonable factfinder of all the elements of a prima facie case of discrimination. *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (per curiam). To establish a prima facie case of discrimination, the plaintiff must show by a preponderance of the evidence (1) that he belongs to a protected class, and (2) that he suffered an adverse

---

does it cite any federal court opinions treating it as a state actor for the purposes of George's specific claims.

employment action (3) under circumstances leading to an inference of unlawful discrimination. *Broomer v. Loch Haven Univ.*, No. 4:cv–09–27, 2012 WL 1059745, *8 (M.D.Pa. Feb. 7, 2012) (citing *Page v. Trustees of Univ. of Pa.*, 222 Fed.Appx. 144, 145 (3d Cir. 2007)). A plaintiff can establish an inference of discrimination by showing that he or she was treated differently than similarly situated employees outside of the protected class. *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318–19 (3d Cir. 2000).

If the plaintiff succeeds in presenting a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.*; *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). In this regard, the employer's burden is "relatively light." *Johnson v. Keebler–Sunshine Biscuits, Inc.*, 214 Fed. Appx. 239, 240 (3d Cir. 2007). Indeed, the employer is only required to show that its actions could have been motivated by the proffered legitimate nondiscriminatory reason; proof of actual causation is not required. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).

Finally, if the employer articulates a legitimate nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the employer's proffered reason is pretextual. *Sarullo,* 352 F.3d at 797. The plaintiff may meet this burden by

presenting evidence from which a reasonable factfinder could either disbelieve the employer's articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action. *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997). In doing so, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken.... Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994) (citation omitted). The court must then determine whether the plaintiff's evidence is sufficient "to permit a reasonable factfinder to conclude that the [employer's] reasons are incredible." *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir. 1996).

Alternatively, under a mixed-motive analysis, the plaintiff may establish a claim for discrimination by demonstrating that the adverse employment action was the result of "multiple factors, at least one of which is illegitimate," and that the "illegitimate factor played a motivating part in the adverse decision." *Watson v. Southeastern Pa. Transp. Auth.,* 207 F.3d 207, 215 (3d Cir. 2000). The burden then shifts to the defendant to demonstrate that "it would have reached the same decision even if the protected trait had not been considered." *Id.*

Here, with respect to a pretext analysis, George has satisfied the first two elements of a prima facie discrimination claim because PTC does not dispute that he belongs to a protected class and that he suffered an adverse employment action when he was terminated. In addition, George satisfies the third element of a prima facie claim because he testified that Fairholm baselessly accused him on multiple occasions, including in the weeks surrounding his termination, of disliking white people or favoring people of Indian national origin. While it is not necessarily discriminatory to accuse another of racism, doing so repeatedly and without justification supports an inference of discrimination. Viewing the evidence in a light most favorable to George, a reasonable factfinder could conclude that he satisfies each element of a prima facie claim of discrimination, and the burden therefore shifts to PTC to articulate a legitimate, non-discriminatory reason for the adverse employment action.

PTC has met its burden of articulating a non-discriminatory reason for terminating George. According to PTC, George was terminated due to issues with work performance and interpersonal relations. PTC's proffered reason is supported by several pieces of evidence, including Fairholm's July 2015 and January 2016 notes to file expressing concerns with George's performance; George's September 2015 performance evaluation expressing concerns with his performance; Fairholm's testimony that he met with Compton and Norris several times to discuss George's

performance and on January 21, 2016 to discuss his recommendation to terminate George; and Norris's testimony about her meeting with Fairholm and the fact that she agreed with Fairholm's termination recommendation. The burden thus shifts back to George to show pretext.

George argues that an issue of fact exists as to whether PTC's articulated reason is pretext because his only evaluation rated his performance as "satisfactory," because he was never disciplined during his tenure, and because "other similarly situated white employees outside Plaintiff's protected class were not fired, even though their performance was worse than Plaintiff's." None of these arguments is persuasive. George's argument that his sole performance evaluation rated his performance as "satisfactory" is superficially appealing but overlooks the numerous substantive critiques contained in the evaluation and the multitude of other concerns Fairholm expressed both before and after the evaluation. George's contention that he was never disciplined during his tenure is similarly unavailing. The evidence shows that Fairholm's primary concerns related to George's work performance and ability to adequately perform his duties, and as Fairholm and Norris testified, there was little reason to believe that formal discipline or reprimand would have resolved those concerns.

Finally, George's argument that PTC did not terminate similarly situated Caucasian employees that performed worse than him is not supported by the record.

The evidence shows that Fairholm expressed concerns with George's performance as early as five months after George joined PTC, and that he continued to express those concerns for the remainder of George's eleventh-month tenure. While George attempts to compare his one "satisfactory" performance review to those received by two Caucasian employees, Joseph Suess and Jeffrey Beard, the comparisons do not withstand scrutiny. Suess's and Beard's performance evaluations stress each employee's "vital role" and "history and experience" with PTC and contain but a fraction of the criticisms received by George. Most importantly, George submits no evidence to suggest that Fairholm or PTC had protracted concerns with either employee's ability to perform their duties.

Despite George's failure to show that PTC's proffered reason for his termination is pretext, he has nevertheless presented sufficient evidence from which a reasonable factfinder could conclude, by a preponderance of the evidence, that race or national origin was a motivating factor for his termination. As discussed above, George testified that Fairholm accused him multiple times, including within weeks of his termination, of disliking white people or favoring individuals of Indian national origin. It is not necessarily discriminatory to accuse another of discrimination, but doing so repeatedly and without any articulable basis whatsoever is an entirely different story and suggests that the remarks may have had more to do with Mr. George's race than his conduct. *See generally DeCarolis v. Presbyterian*

*Med. Ctr. of Univ. of Pennsylvania Health Sys.*, 554 F. App'x 100, 104 (3d Cir. 2014). A reasonable jury could thus infer from Fairholm's alleged comments—particularly those that were "made at a time proximate to the challenged decision"—that a "discriminatory attitude was more likely than not a motivating factor in the defendant's decision." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (cleaned up).

To be sure, some pieces of the record support that George's termination was not motivated by race, including the fact that Fairholm himself recommended hiring George just eleven-months before he recommended termination. In addition, despite George's testimony that Fairholm accused him of improperly favoring two job candidates of Indian national origin, the evidence shows that Fairholm ultimately recommended both candidates. Viewing the record in its entirety, however, these considerations go to the weight of evidence and do not preclude George from showing that race discrimination played some role in his termination. *Cf. Pivirotto v. Innovative Sys., Inc.*, No. 98-3609, 1999 WL 737877, at *9 (3d Cir. July 13, 1999); *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 496 n.6 (3d Cir. 1995). In sum, viewing the evidence in a light most favorable to the non-moving party, a reasonable factfinder could conclude that discrimination played a motivating part in George's termination,

and PTC is not entitled to summary judgment on George's discrimination claims, which may proceed under a mixed-motive framework.[5]

**b. PTC is entitled to summary judgment on George's hostile work environment claim.**

George also asserts a claim for hostile work environment.[6] To establish a prima facie hostile work environment claim, the plaintiff must show (1) intentional discrimination based on race (2) severe or pervasive conduct; (3) a detrimental effect on the plaintiff; (4) a detrimental effect on a reasonable person in similar circumstances; and (5) the existence of respondeat superior liability. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 786-87 (1998). Offhand comments and isolated incidents are typically insufficient to establish a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). At the same time, even infrequent discriminatory acts may rise to the level of a hostile work environment where they are particularly extreme. *See Castleberry*, 863 F.3d at 265.

---

[5] George may proceed under a mixed motive framework on each of his discrimination claims. *See Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 592 (E.D. Pa. 2020). To the extent that the framework applies differently to some of George's claims, *see Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182 n.5 (3d Cir. 2009), those differences have no impact on the court's disposition of PTC's motion.

[6] The court need not address PTC's argument that the George's complaint does not actually assert a claim based on hostile work environment, since any such claim fails on the merits.

A hostile work environment violates Title VII only if it is so severe and pervasive that it "alters the conditions of the victim's employment" and creates an "abusive working environment." *Greer v. Mondelez Glob., Inc*., 590 F. App'x 170, 173 (3d Cir. 2014) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001)). Hostility is assessed both objectively and subjectively. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). In assessing hostility, the court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Castleberry,* 863 F.3d at 264 (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23 (1993)).

Here, PTC is entitled to summary judgment on George's hostile work environment claim because the conduct alleged by George was insufficiently severe and pervasive to support a claim as a matter of law. The remarks alleged by George were relatively infrequent, occurring approximately three times throughout his eleven-month tenure, and they were limited to Fairholm privately accusing George of disliking white people. The remarks are not alleged to have been physically threatening and did not involve the use of profanity or public shaming or humiliation. Even viewing the evidence in a light most favorable to George, the alleged remarks do not amount to severe or pervasive discrimination for purposes of a hostile work

environment claim. PTC is therefore entitled to summary judgment on George's claim for hostile work environment.

    **c. <u>PTC is entitled to summary judgment on each of George's retaliation claims.</u>**

    The complaint also alleges retaliation under 42 U.S.C. § 1981, Title VII, and the PHRA. As with George's discrimination claims, each of his retaliation claims are analyzed using the same framework. *See Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001).

    As with George's discrimination claims, claims for retaliation are analyzed using the *McDonnell Douglas* burden-shifting framework. *Anderson v. Boeing Co.*, 694 F. App'x 84, 88 (3d Cir. 2017). In order to establish a retaliation claim, the plaintiff must first submit evidence showing (1) that he or she engaged in a protected activity; (2) that the employer took an adverse action against him or her; and (3) that there was a causal connection between the protected activity and adverse employment decision. *Id.* If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 86. If the defendant meets its burden, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's reason is pretextual. *Id.*[7]

---

[7] To the extent that George pleads a retaliation claim under Section 1983, it would appear to be subsumed by his Title VII retaliation claim. *See Bair v. City of Atl. City*, No. 99-5232, 2000 WL

Here, George raises two arguments in support of his prima facie claim. George's first argument is that he has established a prima facie retaliation claim because he was terminated after he "complained to multiple parties about Fairholm's discriminatory remarks." (Doc. 71 p. 12 (citing Doc. 72 ¶¶ 10, 15, 47, 49, 50, 51).) The materials cited by George show that in August 2015, George told Ojo that Fairholm accused him of disliking white people. (*Id.* ¶¶ 15, 47, 50, 51.) In addition, according to testimony by Franklin, George told him on two occasions that Fairholm accused him of disliking white people. (*Id.* ¶¶ 15, 47.)

It is well-established that opposition to unlawful discrimination "can take the form of informal protests of discriminatory employment practices, including making complaints to management." *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006). Considering Ojo's role as Director of Diversity of Inclusion and George's testimony that he reported the remark to raise awareness, George's August 2015 informal complaint to Ojo is sufficient evidence of a protected activity. There is no reason to believe, however, that George's conversations with Franklin, his subordinate, were accompanied by a good faith belief of opposition to unlawful discrimination, and as such they do no rise to the level of a protected activity and cannot support George's retaliation claims.

---

1897391, at *6 n.3 (D.N.J. June 16, 2000) (collecting cases). Regardless, the issue has no impact on the court's resolution of PTC's motion.

While George's August 2015 complaint satisfies the first element of a prima facie claim, George provides no evidence of a causal connection between the complaint and his subsequent termination. A plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196–97 (3d Cir. 2015) (citations omitted). Fairholm testified that he was not aware of any complaint by George prior to terminating his employment. (Doc. 62-2 ¶ 73.) George offers nothing to rebut this evidence, and he makes no argument that any other relevant decisionmaker knew about his complaint. (*See* Doc. 72 ¶ 73.) As such, George fails to establish a prima facie retaliation claim based on his August 2015 informal complaint.

George's second argument in support of a prima facie claim is that he "complained about discrimination against other Indian people just days before he was fired." (Doc. 71 p. 12 (citing Doc. 72 ¶ 57).) George contends that "[i]f the plaintiff shows that the decisionmaker was aware of the protected conduct, then the plaintiff may use the temporal proximity between that knowledge and the adverse employment action to argue causation." (Doc. 71 p. 12.) This argument is also unpersuasive, as none of the materials cited by George suggest that he informally or formally complained about discrimination in the days leading up his termination.

(*See* Doc. 72 ¶ 57; *see also* ¶ 58.) [8] The relevant paragraphs of George's Counterstatement of Material Facts instead allege that George recommended hiring two individuals of Indian national origin shortly before his termination, and that Fairholm replied to the recommendations by asking George "Is he Indian as well?" and "Why did you choose this person? So you don't like white people?" But George makes no argument that the recommendations themselves were protected activities, and any such argument would be unlikely to succeed in any event, since it is undisputed that recommending qualified candidates was one of George's regular job duties. (Doc. 72 ¶¶ 57, 58.) *See Atkinson v. Lafayette Coll.*, 653 F. Supp. 2d 581, 598–99 (E.D. Pa. 2009) ("Numerous courts dealing with retaliation claims…have held that in order to engage in a statutorily protected activity the employee must step outside his or her role of representing the company") (internal citations and quotations omitted) (collecting cases). George therefore fails to establish a prima facie retaliation claim and PTC is entitled to summary judgment on each of George's retaliation claims.[9]

---

[8] While Paragraph 73 of George's Counterstatement of Material Facts avers that George complained about Fairholm's "refusal to hire Indian people," the only evidence he provides is fourteen lines from the deposition transcript of PTC's corporate designee discussing George's complaint to Ojo in August 2015. (Doc. 72 ¶ 73 (citing Doc. 71-5 p. 20 at 71:9-23).)

[9] Even if George could show a protected activity in connection with his recommendations, he could not establish any causal connection because there is no genuine dispute that Fairholm decided to terminate George before George recommended hiring Pedapati (Doc. 62-2 ¶¶ 76-77), and that Fairholm agreed with George's recommendation to promote Suryakumar. (*See e.g.*, Doc. 71-3 p. 3) ("Q - Do you know who specifically recommended Bhaskar be promoted? A - Myself and Biju

## IV.    **CONCLUSION**

For the reasons set forth above, PTC's motion for summary judgment will be granted in part and denied in part. An appropriate order shall follow.

*/s/ Sylvia Rambo*
SYLVIA H. RAMBO
United States District Judge

Dated: March 31, 2021.

---

talked about it frequently, and we went to Scott Fairholm requesting approval to submit a request for promotion. Q - What happened when you went to Scott Fairholm about that? A - Scott gave us permission to begin the process to proceed."); (Doc. 71-3 p. 7) ("Q - Do you know if [Fairholm] had any questions about Bhaskar? A - He knew Bhaskar's work, and I believe he was on board with us proceeding.") George's inability to show any causal connection between a protected activity and his termination also precludes him from proceeding under a mixed-motive framework.